Filed 10/6/22  P. v. Barbero CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>JENNIFER BARBERO,<br><br>        Defendant and Appellant. | A160615<br><br>(Alameda County<br>Super. Ct. No. 17-CR-018430) |

Defendant Jennifer Barbero struck and killed a man while driving under the influence (DUI) of alcohol and cocaine.  Based on defendant's history of multiple prior DUI arrests and convictions, the prosecution charged defendant with murder under a theory of implied malice pursuant to *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*) (known as *Watson* murder), and a jury found her guilty of second degree murder.

On appeal, defendant raises numerous challenges to her conviction. She contends she was deprived of her constitutional rights to equal protection and a representative jury because the prosecution exercised peremptory challenges against two prospective jurors based on their race.  She argues she was deprived of her Fourth Amendment right against unreasonable searches and seizures when the police, after trying and failing to obtain a warrant, had defendant's blood drawn without a warrant.  Defendant makes additional claims for violations of her right to due process, her Fifth

1

Amendment right against self-incrimination based on police questioning at the time of arrest, and her Sixth Amendment right to confront one of the laboratory analysts who tested her blood, as well as claims of instructional error and prosecutorial misconduct. We find no prejudicial error, either individually or cumulatively, and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

On May 26, 2017, shortly after 10:00 a.m., David Nemeroff stood next to the open door of his silver sedan, which was parked on the shoulder of Isabel Avenue in Livermore. Witness Neal F.[2] was driving southbound on Isabel Avenue when he saw Nemeroff standing by the silver car and looking at something in his hand. The car door was open but it was not blocking any lanes of traffic, and the vehicle's hazard lights were flashing. Neal F. then saw a black sports utility vehicle (SUV) in the right hand lane approach the location of the silver car. "For some reason [the black SUV] swerved" to the right and hit the back left side of the silver car before continuing down the road. The force of the collision sent Nemeroff and his car door about 60 feet down the road.

Tyler R. was driving on Isabel Avenue when he saw a car collision and "a man being flung in the air" with his "leg up in the air like a rag doll." Tyler R. pulled over and called 911. He saw defendant come from the direction of the black SUV and access that vehicle. David E., an off-duty firefighter and paramedic, also stopped at the scene and attended to the

---

[1] Additional background facts relevant to the contentions on appeal are set forth in the corresponding sections of the Discussion, *post*.

[2] Pursuant to California Rules of Court, rule 8.90(b), which governs privacy in opinions, we refer to the witnesses and prospective jurors either by their first name and first initial of their last name, or by their initials only. (Cal. Rules of Court, rule 8.90(b)(4), (10).)

injured man, who was unresponsive and bleeding from the head. David E. heard defendant "say to the effect of, 'I didn't mean to hit him. It was an accident.' "

Nemeroff was eventually transported to a hospital where he died of complications from blunt force injuries.

Livermore Police Officer Keith Pini arrived at the accident scene at around 10:30 a.m. He spoke with Livermore Police Sergeant Glen Robbins and several witnesses before he was approached by defendant. Pini asked defendant if she was the driver of the black SUV, and she said she was. Pini did not initially notice any signs that defendant was intoxicated, but due to the severity of the collision and the information he received from Robbins, Pini asked defendant if she would submit to a blood draw to rule out any alcohol or drugs in her system. Defendant refused.

Robbins detected the odor of alcohol on defendant's breath and asked her to take off her sunglasses and follow his fingers with her eyes. Robbins observed involuntary jerking of defendant's eyes, which was "a very common indicator when alcohol has been used or ingested," and Pini noticed that defendant's eyes were red and watery. Robbins asked defendant when she last had a drink, and she said 10:00 p.m. the prior day.

Robbins directed Pini to conduct a DUI investigation. Pini administered four field sobriety tests: the horizontal gaze nystagmus (HGN) test; the modified Romberg test; the heel-to-toe walk; and the one leg stand. Based on her performance and other factors suggesting impairment, defendant was arrested.[3] Pini then asked defendant once again if she would submit to a blood or breath test, and defendant again declined.

---

[3]     Body camera footage of the arrest was admitted into evidence as People's exhibit No. 11. Although the related transcript was not admitted,

3

Defendant was taken to ValleyCare Medical Center where she was medically cleared of any injury. Meanwhile, Pini and Robbins attempted but were unable to reach the on-call judge or another judge who could issue a warrant for a blood draw. Approximately 45 minutes after the time of the arrest, Pini and Robbins made the decision to go forward with a warrantless blood draw. Defendant was taken to Santa Rita Jail, where her blood was drawn by a certified phlebotomist at approximately 1:19 p.m. Twenty minutes later, the requested warrant was issued by the Honorable Michael J. Gaffey.

On June 1, 2017, two vials of defendant's blood were received at Central Valley Toxicology, Inc. (CVT). Bioanalyst Alan Barbour utilized a gas chromatograph coupled with a flame ionization detector to perform alcohol testing, and CVT director Bill Posey performed drug testing. A toxicology analysis dated June 6, 2017, reported the presence of cocaine in the sample and a blood alcohol content (BAC) of 0.13 percent. A second blood-alcohol analysis performed by Posey in January 2019 revealed a BAC of 0.11 percent.

Defendant was charged by information with one count of murder (Pen. Code, § 187, subd. (a)). A jury trial was held in January 2020. During its case in chief, the prosecution presented evidence of defendant's three prior DUI-related arrests and convictions in 2008, 2014, and 2015. The relevant details were as follows.

In January 2008, defendant pleaded no contest to one count of misdemeanor DUI (Veh. Code, § 23152, subd. (a).) Her plea agreement

---

both parties quote from the transcript in their respective briefs. We do likewise, as our review of the video footage confirms the accuracy of the transcript.

4

contained a signed "*Watson* admonishment" stating: "You are hereby advised that being under the influence of alcohol or drugs, or both, impairs your ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If you continue to drive while under the influence of alcohol or drugs, or both, and, as a result of that driving, someone is killed, you can be charged with murder." Defendant was also ordered to attend an outpatient drug and alcohol recovery program called Second Chance, Inc. (Second Chance).

In February 2014, defendant pleaded no contest to misdemeanor "wet reckless" charges (Veh. Code, §§ 23103, 23103.5). The 2014 plea agreement included a signed *Watson* admonishment identical to the one in the 2008 plea agreement.

In October 2015, highway patrol officers responded to a report of a traffic collision. They found an unoccupied vehicle on the road and defendant sleeping in a bush. She exhibited signs of intoxication, including smelling of alcohol, red and watery eyes, and unsteadiness. After defendant refused to perform any field sobriety tests, she was placed under arrest for DUI and transported to a hospital where a certified phlebotomist performed a blood draw. Gas chromatograph testing performed by Barbour revealed a BAC of 0.19 percent.[4]

The jury found defendant guilty of second degree murder, and the trial court sentenced her to 15 years to life in state prison. This timely appeal followed.

---

[4]     Defendant was eventually convicted of a "wet reckless" in connection with the 2015 arrest, but the trial court granted defendant's motion in limine to exclude evidence of that conviction.

DISCUSSION

## A. *Batson-Wheeler* Motion

Defendant contends she was deprived of her rights to equal protection and a representative jury because the prosecution exercised peremptory challenges against prospective jurors M.I. and F.W. on the basis of their race. We conclude the trial court did not err in finding that defendant failed to make a prima facie showing of discriminatory intent.

### 1. *Background*

There were 82 prospective jurors present for voir dire. In their written questionnaires, four prospective jurors identified their race or ethnic group as "Black," "Black American," or "African American."

M.I. described her racial or ethnic group as "mixed." She indicated that she was a public school teacher and had gone to a "jail, prison, or juvenile detention facility" to "visit a student." In response to question 30, which asked "[w]hat comes to mind when you think of" police officers, prosecutors, and defense attorneys, M.I. left the space blank for police officers and defense attorneys but wrote "law and order" for prosecutors. Regarding her feelings about the fairness of the criminal justice system, M.I. wrote that it "depends on the place/time/other  specifics."

F.W. described his race as "Black." He indicated he had been previously "accused, arrested or prosecuted" for "carrying a loaded weapon pistol." In response to question 30, F.W. wrote that he associated police officers with "searching me & my car for nothing." His opinion of prosecutors was "not good," and his opinion of defense attorneys was "somewhat good." He felt the criminal justice system was "not good for black people" and also indicated he had uncomfortable or negative feelings toward "Hispanics" and "White people."

6

Neither M.I. nor F.W. was among the first 12 venirepersons to sit in the jury box during voir dire.  M.I. was eventually called to replace the initial venireperson in seat number 9.  The trial court asked M.I. if she wanted to amend or supplement her questionnaire and if she could think of any reason why she could not be fair and impartial.  She answered no to both questions.  Neither side asked M.I. any questions before the prosecution excused her.  M.I. was replaced by a venireperson who was excused for hardship, followed by Juror no. 9.[5]

For the next several rounds, the prosecution passed on its peremptory strikes while the defense struck several venirepersons before F.W. was called to seat number 8.  The prosecutor asked F.W. whether his prior experience with law enforcement would influence him as a juror, and he responded, "No."  Asked whether he was "going to think [law enforcement] were targeting a suspect or arresting them for no reason," F.W. responded, "In this case? [¶] . . . . [¶] No, ma'am."  The prosecutor then asked F.W. why he felt " '[n]ot good' " about prosecutors, and he responded, "Because he took my gun.  I think he took it personally."  Asked if his "feelings about prosecutors" were "targeted toward that specific prosecutor that you dealt with on that case," F.W. responded, "No, don't know him."  The following exchange then occurred:

"Q.  . . . .  So given what happened to you, that's a general feeling for everyone in the district attorney's office.

"A.  It could be.

"Q.  Is it?

"A.  It could be.

---

[5]  Juror no. 9 was one of two Black venirepersons, along with Juror no. 11, ultimately seated on the jury.

"Q.  Okay.  So that's a possibility for me that I'm going to be potentially, or, I could be lumped in with that opinion since I work for the same people?

"A.  Everybody has gotta have a job."

The prosecutor rephrased the question, asking whether F.W. was "going to hold it against me what happened to you."  This time, F.W. responded, "I don't hold anything against you.  I don't really know you."  F.W. further stated that his past experiences would not be imputed to the prosecutor or influence the way he saw her presenting evidence in this trial. Asked if he would hesitate to give a guilty verdict if the prosecution met its burden and proved everything to him beyond a reasonable doubt, F.W. responded, "Could be."  When asked why, F.W. stated, "If the evidence was, you know, if the evidence came out and everything and we decided then, you know, I would have to come to that conclusion."  The prosecutor then asked, "you wouldn't hesitate to do that if I did everything I should," and F.W. responded, "No, I wouldn't hesitate."

The defense asked no questions before the prosecution excused F.W. Defense counsel then lodged a *Batson-Wheeler* challenge,[6] arguing that F.W. had been excused because he was Black.  The trial court stated, "Are there— I'm trying to remember if there were any other African-American members who had been excused, and I can't."  The prosecutor responded, "There hasn't been."  The court then remarked (in apparent reference to Juror no. 9), "We've got one other African-American juror who's sitting right next to [F.W.]"

---

[6]     *Batson v. Kentucky* (1986) 476 U.S. 79, *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

Defense counsel responded, "I believe [M.I.] is African-American." The trial court noted that M.I. had self-identified as "mixed," and that although she was "dark complected," the court could not "say with confidence what mixed races she comes from." Defense counsel responded, "To me, it's clear that she's some percentage black. Now, I don't know if it's 20 percent, 40 percent, or 60 percent. I don't know if anybody knows that, but what she says, mixed race, and by looking at her, I could see that she was partially black. I believe this is the second African-American juror excused by the prosecution, and they all—both those two prospective jurors answered all of the questions correctly, not that that means the prosecutor wants to keep them."

The trial court found that defendant had not made a prima facie case of discrimination as to M.I. and then turned its attention to F.W. The court found that although F.W. gave "basically all the right answers," he "played everything close to the vest, and that he did express different attitudes about both prosecutor and defense lawyer when questioned about it, then he really started playing it close to the vest. And, frankly, based on that alone, I was expecting him to get challenged by [the prosecutor]. And, frankly, it doesn't appear to me it had anything to do with race." The court denied the *Batson-Wheeler* motion.

### 2. *Analysis*

"The purpose of peremptory challenges is to allow a party to exclude prospective jurors who the party believes may be consciously or unconsciously biased against him or her." (*People v. Jackson* (1992) 10 Cal.App.4th 13, 17–18.) A valid peremptory challenge may be based on "the obviously serious to the apparently trivial, from the virtually certain to the highly speculative." (*Wheeler*, *supra*, 22 Cal.3d at p. 275.) However, "[b]oth the United States and

9

California Constitutions prohibit the exercise of peremptory strikes on the basis of race or ethnicity." (*People v. Battle* (2021) 11 Cal.5th 749, 772.) "Excluding by peremptory challenge even 'a single juror on the basis of race or ethnicity is an error of constitutional magnitude.' " (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1172 (*Gutierrez*).)

"The now familiar *Batson-Wheeler* inquiry consists of three distinct steps. First, the opponent of the strike must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of peremptory challenges. Second, if the prima facie case has been made, the burden shifts to the proponent of the strike to explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications. Third, if the party has offered a nondiscriminatory reason, the trial court must decide whether the opponent of the strike has proved the ultimate question of purposeful discrimination." (*People v. Scott* (2015) 61 Cal.4th 363, 383 (*Scott*).)

"Although the question at the first stage concerning the existence of a prima facie case depends on consideration of the entire record of voir dire as of the time the motion was made [citation], we have observed that certain types of evidence may prove particularly relevant. [Citation.] Among these are that a party has struck most or all of the members of the identified group from the venire, that a party has used a disproportionate number of strikes against the group, that the party has failed to engage these jurors in more than desultory voir dire, that the defendant is a member of the identified group, and that the victim is a member of the group to which the majority of the remaining jurors belong. [Citation.] A court may also consider nondiscriminatory reasons for a peremptory challenge that are apparent from

and 'clearly established' in the record [citations] and that necessarily dispel any inference of bias." (*Scott, supra*, 61 Cal.4th at p. 384.)

" ' "We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges ' "with great restraint." ' [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." ' " (*People v. O'Malley* (2016) 62 Cal.4th 944, 975 (*O'Malley*).)

Defendant contends that the "numbers" support a prima facie case of discriminatory intent here because at the time of her *Batson-Wheeler* motion, the prosecution had excused two out of three Black venirepersons. We will assume for the sake of this argument that M.I. is properly included in this total. But even so, the absolute size of the sample in question is still too small to infer discriminatory intent. Courts have often "found it ' "impossible," ' as a practical matter, to draw the requisite inference where only a few members of a cognizable group have been excused and no indelible pattern of discrimination appears." (*People v. Garcia* (2011) 52 Cal.4th 706, 747, citing *People v. Bonilla* (2007) 41 Cal.4th 313, 342–343 [no prima facie showing where prosecutor excused two Black venirepersons leaving none in 78-person pool]; see also *People v. Johnson* (2019) 8 Cal.5th 475, 507–508 (*Johnson*) [assigning "no great weight" to exclusion of three of six Black venirepersons]; *People v. Parker* (2017) 2 Cal.5th 1184, 1212 (*Parker*) [no prima facie showing even assuming prosecutor struck only two Black venirepersons in jury pool given small sample size].)

The cases cited by defendant are distinguishable. In *Castellanos v. Small* (9th Cir. 2014) 766 F.3d 1137, 1147, the defendant's prima facie showing was not disputed. In *Fernandez v. Roe* (9th Cir. 2002) 286 F.3d 1073 (*Fernandez*), *Turner v. Marshall* (9th Cir. 1995) 63 F.3d 807 (*Turner*), and *Gutierrez, supra*, 2 Cal.5th 1150, the courts were presented with considerably larger sample sizes. (See *Fernandez*, at p. 1078 [four of seven Hispanic members and two Black members stricken]; *Turner*, at p. 812 [five of nine Black members stricken]; *Gutierrez* at p. 1154 [10 of 16 Hispanic members stricken].) Notably, *Fernandez* found that the prosecution's striking of the only two Black members was insufficient "standing alone" to support an inference of discrimination, but combined with the number of Hispanic members stricken, gave rise to a prima facie case. (*Fernandez*, at pp. 1078–1079.) Similarly, the excusal here of two of three Black members of the jury pool, standing alone, did not support an inference of discrimination. In light of this small sample size, we can assign no great weight to the numbers themselves. (*Johnson, supra*, 8 Cal.5th at pp. 507–508.)

We further observe that the prosecutor did not use a disproportionate number of peremptory strikes against the group in question. (See *People v. Bell* (2007) 40 Cal.4th 582, 597–598 [no disproportionate use where only two of prosecutor's 16 strikes were exercised against Black women].) By our count, the prosecutor used a total of 15 peremptory strikes, and defendant contends only two of these prospective jurors (M.I. and F.W.) were Black.

Furthermore, insofar as defendant's numerical analysis is premised on two Black venirepersons having been excluded from the jury, it is relevant to our consideration of the totality of the circumstances that the trial court found M.I.'s race or ethnicity to be inconclusive. M.I. identified herself in her juror questionnaire as "mixed" without further elaboration, and the court,

12

based on its own observations of M.I., could not say that she was part Black. While we acknowledge the difficulties and subjectivity inherent in any attempt to identify the races of a person of mixed race based solely on their appearance, on a cold appellate record such as this, where the trial court was able to observe M.I.'s appearance firsthand in a way we cannot, we must give "great deference" to the court's ability to ferret out discriminatory intent. (*O'Malley*, *supra*, 62 Cal.4th at p. 975.)

Defendant argues it was undisputed that M.I. was part Black because after defense counsel made this claim, "[f]rom that point forward the prosecutor did not contest defense counsel's claim . . . or voice any disagreement with counsel's statement." The transcript, however, clearly reflects that the prosecutor had already taken the position that she did not consider M.I. to be Black when she told the trial court "[t]here [hadn't] been" any Black members excused prior to F.W. This was not a case where a prospective juror of "mixed" race was regarded as Black in appearance "without disagreement from the prosecutor." (See *People v. Harris* (2013) 57 Cal.4th 804, 859, fn. 1 (conc. opn. of Kennard, J.).)

Also relevant to our consideration of the totality of the circumstances is the fact that after M.I. was excused, she was eventually replaced by Juror no. 9, who was Black. The prosecution then passed on Juror no. 9 for several rounds before the defense lodged its *Batson-Wheeler* motion, and the juror was ultimately seated (along with another Black member) on the jury. Citing *People v. Snow* (1987) 44 Cal.3d 216, defendant cautions against placing too much significance on the prosecution's willingness to pass on one Black juror, as this would, in *Snow*'s words, "provide an easy means of justifying a pattern of unlawful discrimination which stops only slightly short of total exclusion." (*Id*. at p. 225.) But *Snow* clarified that the passing of certain jurors "is not a

*conclusive* factor" and may still "be an indication of the prosecutor's good faith in exercising his peremptories" and "an appropriate factor for the trial judge to consider." (*Ibid.*) Here, we recognize that the prosecution's acceptance of Juror no. 9 at the time of F.W.'s dismissal, as well as the ultimate seating of two Black persons on the jury, are among the totality of relevant facts supporting the determination that defendant failed to make a prima facie showing of discriminatory intent.

As for F.W., defendant argues that the trial court impermissibly speculated as to the prosecutor's motives for striking him. While the trial court did not ask the prosecutor to state her reasons for excusing F.W., it does not follow that the court engaged in impermissible speculation. Our Supreme Court has made clear that a prima facie case may be found lacking where "the record discloses readily apparent, race-neutral grounds for a prosecutor to use peremptory challenges." (*People v. Rhoades* (2019) 8 Cal.5th 393, 430 (*Rhoades*).) "[W]hen the record of a prospective juror's voir dire or questionnaire on its face reveals a race-neutral characteristic that any reasonable prosecutor trying the case would logically avoid in a juror, the inference that the prosecutor was motivated by racial discrimination loses force. " (*Id.* at p. 431; see *Scott*, *supra*, 61 Cal.4th at p. 384.)

Here, F.W.'s questionnaire responses provided readily apparent, race-neutral grounds for his excusal, as he openly expressed negative sentiments towards law enforcement and prosecutors based on personal experience. When the prosecutor gave F.W. the opportunity to clarify his remarks during voir dire, he gave responses that, at times, served to exacerbate the prosecutor's reasonable concerns. For instance, in response to questions about whether his negative sentiments applied to "everyone in the district attorney's office," he twice responded, "It could be." Asked whether he might

14

"hesitate to give a guilty verdict if [the prosecution] met [its] burden and proved everything to [him] beyond a reasonable doubt," F.W. again responded, "Could be." Although F.W. eventually walked back some of these statements when pressed, the trial court, based on its observations of F.W., remarked that his responses were "close to the vest." Deferring to the trial court's observations, we conclude on this record that any reasonable prosecutor would have seen fit to excuse F.W. (*Rhoades*, *supra*, 8 Cal.5th at pp. 430–431.)

Defendant contends the trial court's "close to the vest" comment demonstrates its consideration of evidence that is presumptively invalid under Code of Civil Procedure section 231.7, subdivision (g)(1)(A)–(C). She acknowledges, however, that the statute did not apply to this trial. (See Code Civ. Proc., § 231.7, subd. (i) [section applies only to trials in which jury selection began on or after January 1, 2022].) In any event, we fail to see how the cited portions of the statute apply here, as F.W. was not excused for being "inattentive, or staring or failing to make eye contact," "exhibit[ing] either a lack of rapport or problematic attitude, body language, or demeanor," or giving "unintelligent or confused answers." (Code Civ. Proc., § 231.7, subd. (g)(1)(A)–(C).) Rather, the trial court's "close to the vest" comment appeared to reflect its view that F.W.'s cautious testimony did not assuage concerns about the negative sentiments he expressed in his questionnaire. Furthermore, the statutory presumption of invalidity does not apply if "the trial court is able to confirm that the asserted behavior occurred, based on the court's own observations." (Code Civ. Proc., § 231.7, subd. (g)(2).) Here, the trial court's remark was based on its own observations of F.W. Thus,

even if it were applicable to this trial, Code of Civil Procedure section 231.7, subdivision (g), would not support a finding of error.[7]

Finally, defendant argues that a comparative juror analysis supports a prima facie case of bias. Comparative juror analysis involves "side-by-side comparisons" of " ' "[s]imilarly situated" ' " stricken and seated jurors. (*Miller-El v. Dretke* (2005) 545 U.S. 231, 241, 291 (*Miller-El*).) "The rationale for comparative juror analysis is that a side-by-side comparison of a prospective juror struck by the prosecutor with a prospective juror accepted by the prosecutor may provide relevant circumstantial evidence of purposeful discrimination by the prosecutor." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 109.) If the prosecutor's proffered reason for striking a minority panelist applies just as well to a similar nonminority who is permitted to serve, this may tend to prove purposeful discrimination. (*Miller-El*, at p. 241.) Although some courts have declined to conduct a comparative juror analysis at the first *Batson-Wheeler* stage (see, e.g., *Parker*, *supra*, 2 Cal.5th at p. 1213), the Supreme Court has clarified that "juror comparisons can play a role" at this stage of the analysis. (*Rhoades*, *supra*, 8 Cal.5th at p. 432, fn. 17.)

---

[7]     Defendant also makes reference to Code of Civil Procedure section 231.7, subdivision (e)(1), which presumptively invalidates a peremptory challenge based on a prospective juror's expression of "distrust of or having a negative experience with law enforcement or the criminal legal system" unless "the party exercising the peremptory challenge can show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's race, ethnicity," or other specified characteristic, "and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case." Once again, the statute did not apply to this trial (Code Civ. Proc., § 231.7, subd. (i)), and even if it did, for the reasons already discussed, the prosecutor's readily apparent grounds for excusing F.W. bore on his ability to be fair and impartial in this case and did not appear related to F.W.'s race.

16

Defendant argues that a comparison between F.W. on the one hand, and Juror no. 2, Juror no. 6, and Darren B. on the other, raises an inference of purposeful discrimination because like F.W., the latter three individuals all had prior criminal histories.[8]  But this argument quickly falls apart for Darren B., who was not a seated juror and, in fact, was excused by the prosecution.  As for Juror no. 2 and Juror no. 6, their questionnaires disclosed no negative opinions or feelings towards law enforcement and prosecutors.[9]  Accordingly, the prosecution's readily apparent reasons for striking F.W. simply did not apply to Juror no. 2 and Juror no. 6.

Defendant contends that Juror no. 5's response to question 30 should have prompted further questioning from the prosecution.  But Juror no. 5 simply stated that he did not "know any [prosecutors] for context."  Notably, he described no negative feelings or experiences with law enforcement or prosecutors.  Thus, the prosecutor's failure to question Juror no. 5 does not "negate the force of" the readily apparent, nondiscriminatory reasons for excusing F.W.  (*Rhoades*, *supra*, 8 Cal.5th at p. 432.)

In sum, defendant fails to demonstrate that the totality of relevant circumstances gave rise to an inference of discriminatory purpose in the prosecution's exercise of peremptory challenges against M.I. and F.W.  The *Batson-Wheeler* motion was properly denied.

---

[8]  Juror no. 2 indicated he was once "[h]eld for DUI" and made a related court appearance in 1976.  Juror no. 5 stated he was arrested for trespassing when he was in his twenties, but the record was "expunged."  Darren B. indicated he was "sent to arbitration in 1997" for vandalism.

[9]  In response to question 30, Juror no. 2 wrote "protect" for his feelings towards police officers, and "trial" for his feelings towards prosecutors and defense attorneys.  Juror no. 6 wrote "law enforcement" for his feelings about police officers, "N/A" for prosecutors, and "MONEY!" for defense attorneys.

17

**B. Fourth Amendment**

Defendant argues she was deprived of her Fourth Amendment right against unreasonable searches and seizures when the police had her blood drawn without a warrant. We conclude exigent circumstances justified the warrantless blood draw.

### 1. *Background*

Defendant moved to suppress the blood sample evidence as having been obtained without a warrant in violation of the Fourth Amendment. The motion was heard before Judge Gaffey over the course of several days between January and March 2019.

Officer Pini testified that while defendant was at ValleyCare Medical Center being checked for possible injuries, he began writing an affidavit for a warrant on the Consolidated Records Information Management System (CRIMS), a computerized warrant application system. He submitted an application at 12:22 p.m. Pini testified that "[u]sually, within 5 or 10 minutes, either the judge answers immediately or he calls you back after he's reviewed it and looks over everything." On this occasion however, Pini received no response after 15 minutes, so he contacted the Alameda County Sheriff's Department dispatcher, but the dispatcher would not provide the direct phone number for the on-call judge prior to 5:00 p.m.

Pini explained the situation to Sergeant Robbins, and the two contacted the nearby courthouse in Pleasanton to try and find another judge to review the warrant application. Robbins made contact with the Honorable Joe Carson and the Honorable Roy Hashimoto, but the former did not have access to CRIMS, and the latter had forgotten his password. Robbins made further "attempts to contact other judges from outside jurisdictions" but "due to the lunch hour" was "unable to locate any."

Pini testified that he was concerned "about losing evidence" because "the body metabolizes [alcohol] and the blood alcohol rate goes down" over time, and 45 minutes had already elapsed since the time of defendant's arrest. Pini estimated that in order to submit a paper warrant application, he would have had to drive for 20 to 30 minutes to the Livermore Police Department, spend another 30 minutes to prepare a paper application, and then drive for another 20 to 25 minutes to the Pleasanton courthouse to file it. Pini and Robbins "decided that based on all the attempts that we've made and the fact that the blood draw search warrant hadn't been signed at that time, we decided to go ahead and do the blood draw."

Pini transported defendant to Santa Rita Jail, and the blood draw took place at 1:19 p.m. Thereafter, at 1:39 p.m., Judge Gaffey issued the requested search warrant.

The trial court denied defendant's motion to suppress, finding that Pini's actions in ordering the warrantless blood draw were not unreasonable. Specifically, Judge Gaffey found that Pini was "working through the process that he knows to deal with the court in obtaining a warrant. It seems reasonable to the court. His conduct seems reasonable. The timing how that he's three hours out, he's probably looking at his watch going now we're three hours out so I know the blood is dissipating and I want to get the blood before it gets any worse." Judge Gaffey further noted that "most courts close from 12:00 to 2:00" and that the trial court here "dropped the ball" by "not having somebody available who is going to sign it." Although Judge Gaffey disagreed with Pini's estimate of 30 minutes to complete a paper warrant application, he generally agreed that with additional travel time, "about another hour" would be lost in order to file a paper warrant, during which the alcohol in

19

defendant's blood would have continued to dissipate, and critical evidence could have been lost.

## 2. *Analysis*

On review from the denial of a motion to suppress, we defer to the factual findings by the trial court that are supported by substantial evidence, and we independently review the reasonableness of the search and seizure under the federal Constitution. (*People v. Meza* (2018) 23 Cal.App.5th 604, 609 (*Meza*).)

The Fourth Amendment to the United States Constitution safeguards the right to be free from unreasonable searches and seizures by requiring that law enforcement first obtain a search warrant supported by probable cause. A blood draw is a search for Fourth Amendment purposes. (*Birchfield v. North Dakota* (2016) 579 U.S. 438.) A warrantless search is per se unreasonable unless the People prove that the search comes within a recognized exception to the warrant requirement. (*People v. Laiwa* (1983) 34 Cal.3d 711, 725.) One such "exception applies when ' "the exigencies of the situation" make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.' " (*Kentucky v. King* (2011) 563 U.S. 452, 460.) Such exigencies include where law enforcement must render emergency assistance inside a home; enter premises in hot pursuit of a fleeing suspect; or " 'prevent the imminent destruction of evidence.' " (*Ibid.*)

In *Schmerber v. California* (1966) 384 U.S. 757 (*Schmerber*), the United States Supreme Court held that a compulsory blood draw constituted a search for Fourth Amendment purposes, but concluded the warrantless blood draw at issue did not violate the Fourth Amendment because time had already been lost while the responding officer took the DUI suspect to the

hospital and investigated the accident.  (*Id.* at pp. 770–772.)  In so concluding, the court reasoned that the police officer "might reasonably have believed that he was confronted with an emergency" justifying an exception to the warrant requirement because "the percentage of alcohol in the blood begins to diminish shortly after drinking stops."  (*Id.* at p. 770.)

In *Missouri v. McNeely* (2013) 569 U.S. 141 (*McNeely*),  the high court revisited *Schmerber* and reaffirmed that the natural dissipation of alcohol in the blood may, in some circumstances, constitute an exigency justifying a warrantless blood draw.  (*McNeely*, at pp. 151–153.)  *McNeely*, however, refused to adopt a per se warrant exception in every DUI case and instead held that whether "a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances."  (*Id.* at p. 156.)  In rejecting a per se exception, *McNeely* noted that post-*Schmerber* advances in technology allow for "more expeditious processing of warrant applications," for example, judicial consideration of warrant applications by telephone or other electronic means and the use of standard warrant applications in DUI cases.  (*Id.* at pp. 154–155.)  Significantly, however, *McNeely* recognized that "improvements in communications technology do not guarantee that a magistrate judge will be available when an officer needs a warrant" and that "exigent circumstances justifying a warrantless blood sample may arise in the regular course of law enforcement due to delays from the warrant-application process."  (*Id.* at pp. 155–156.)

Contrary to defendant's contentions, here is such a case.  Despite the availability of CRIMS, which allows electronic warrant applications to be reviewed and warrants issued quickly, the officers here were unable to connect with the on-call judge.  The officers then made direct calls to nearby

21

courthouses, seeking a judge who could review the application and issue a warrant, all to no avail. Pini decided not to file a paper warrant application, which as the trial court later determined, would have taken "about another hour" to process. Meanwhile, approximately 45 minutes had elapsed since defendant's arrest, and several hours since the collision itself, with no clear indication as to when defendant had last consumed alcohol. In sum, the delay resulting from the officers' earnest but unsuccessful attempts through CRIMS and other avenues to obtain a warrant, combined with the continuing dissipation of alcohol in defendant's blood, amounted to exigent circumstances that justified the warrantless blood draw in this case. (*McNeely*, *supra*, 569 U.S. at p. 156.)

Defendant's authorities and arguments to the contrary are unpersuasive. For instance, in *Meza*, *supra*, 23 Cal.App.5th 604, Division Two of this court held that exigent circumstances were lacking where several police officers responded to the scene of a DUI accident, but none attempted to obtain a warrant before the suspect's blood was drawn. (*Id*. at pp. 611–612.) But here, Pini and Robbins did what was found lacking in *Meza*—they "tried to get a timely warrant but failed." (*Ibid*.)

Defendant argues that Pini should have known that a warrant would issue shortly after 1:00 p.m. when the lunch hour ended. We disagree. On review, an officer's "judgments about whether the warrant process would produce unacceptable delay under the circumstances" is assessed " ' "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." ' " (*McNeely*, *supra*, 569 U.S. at p. 158, fn. 7.) On this score, we defer to Judge Gaffey's observation that the courthouse was generally closed from 12:00 p.m. to 2:00 p.m. And viewing the circumstances from a reasonable officer's perspective, given the passage of time and the

22

various attempts already made to obtain a warrant, we conclude it was not unreasonable for Pini to harbor doubts that a warrant might issue in time to preserve the necessary evidence.

Defendant argues that the record is silent as to where Judge Gaffey was assigned when he received Pini's warrant application, and what other bench officers were aware of and available to sign the warrant application. On this last point, the record does in fact indicate that two other judges were made aware of the warrant application but were unable to access CRIMS to review it. But more importantly, any lack of additional detail in the record regarding the *trial court's* delay in acting on the warrant application does not undermine the reasonableness of the *officers*' belief that they faced an exigency justifying the warrantless blood draw based on the circumstances outlined above.

In sum, the trial court did not err in denying defendant's motion to suppress the blood sample evidence.

**C. Fifth Amendment**

Defendant argues that her responses to two questions by Officer Pini at the time of her arrest—"Were you not driving that car" and "Did you know if you drink and drive and you kill somebody that . . . [¶] . . [¶] . . . you can be charged for murder"—were taken in violation of her rights under the Fifth Amendment and *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). While we agree that the un-*Mirandized* statements should not have been admitted, we conclude the error was harmless beyond a reasonable doubt.

**1. *Background***

After Officer Pini informed defendant that he was placing her under arrest, defendant repeatedly asked, "Are you serious," or words to that effect. She also stated at one point, "Okay, I'll finding [*sic*] my lawyer right now," to

23

which Pini responded, "That's fine." Defendant continued to ask Pini whether he was being serious, and their exchange continued. After explaining to defendant that she was under arrest for DUI, Pini asked, "Do you wanna listen," and defendant responded, "No. . . [¶] . . . [¶]. . . I actually don't." The following exchange then occurred.

"Q: Were you not driving that car?

"A: Absolutely.

"Q: You were driving that car, right?

"((Crosstalk))

"A: Yes.

"Q: Okay. Well you can't drink and drive.

"A: Uh, yeah, ar—are you being serious?

"Q: Did you know if you drink and drive and you kill somebody that. . .

"A: Uh, hello. . .

"Q: . . . you can be charged for murder?

"A: Uh, absolutely.

"Q: Okay, all right.

"A: Okay I'm calling my lawyer like. . .

"Q: That's fine.

"A: . . . immediately.

"Q: And you're completely entitled to that."

The prosecution moved in limine to admit defendant's post-arrest statements and defendant moved to suppress them. The trial court held an evidentiary hearing during which Pini testified that he did not advise defendant of her *Miranda* rights "[b]ecause she continued to speak," but that he was not trying to elicit incriminating statements from her. Rather, he

24

asked the challenged questions because defendant appeared to be in shock, "almost like she didn't know that she was driving the car."

The trial court agreed that Pini was simply responding to defendant's expressions of incredulity and was not conducting a custodial interrogation for Fifth Amendment purposes. The court found that defendant "just [couldn't] believe, 'Are you guys really serious?' She's treating it like you can't be serious. And I think what he's doing, it appears to me this is not an interrogation that's intended to elicit incriminating statements. This is his way by using questions, almost like rhetorical questions that turned out not to be, but to impress on her how serious he really is. And even though she's clearly in custody, under the circumstances I don't think it's the sort of thing that should be excluded on Fifth Amendment grounds."

### 2. *Analysis*

"The Fifth Amendment privilege against self-incrimination requires officers to inform criminal suspects, before questioning, of their right to remain silent, and that statements made may be used against them in court. [Citation.] That right attaches during a custodial 'interrogation.' " (*People v. Tousant* (2021) 64 Cal.App.5th 804, 821 (*Tousant*), citing *Miranda*, *supra*, 384 U.S. at p. 479.) "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300–301, fn. omitted (*Innis*).) "Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must

nevertheless be excluded from evidence under *Miranda*." (*Oregon v. Elstad* (1985) 470 U.S. 298, 307.)

"Whether an interrogation occurred is determined by 'an objective test according to which we "analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances." ' [Citation.] 'Not every question directed by an officer to a person in custody amounts to an "interrogation" requiring *Miranda* warnings. The standard is whether "under all the circumstances involved in a given case, the questions are 'reasonably likely to elicit an incriminating response from the suspect.' " [Citation.] This is an objective standard. "The subjective intent of the [officer] is relevant but not conclusive. [Citation.] The relationship of the question asked to the crime suspected is highly relevant." ' " (*Tousant*, *supra*, 64 Cal.App.5th at p. 822.)

We can accept that Pini's subjective intent in asking the challenged questions may have been simply to convey in rhetorical fashion why he was placing defendant under arrest. But that intent is not conclusive of the matter (*Tousant*, *supra*, 64 Cal.App.5th at p. 822), and other objective factors supported the reasonable likelihood that Pini's questions would elicit an incriminating response. Defendant was under arrest for DUI, and the challenged questions went beyond what was "normally attendant to arrest and custody." (*Innis*, *supra*, 446 U.S. at pp. 300–301.) Significantly, the questions related factually to her culpability as the driver of the vehicle that was seen hitting the victim. Furthermore, because Pini saw that the victim had suffered severe trauma, his question regarding defendant's knowledge that she could be charged with murder if she killed someone while driving

26

drunk related to her subjective state of mind for purposes of a *Watson* murder charge.  (See *Watson, supra,* 30 Cal.3d at pp. 296–297 [implied malice requires finding that defendant "*actually appreciated*" risk of danger to human life while driving intoxicated].)

Contrary to the People's contentions, defendant's repeated expressions of incredulity did not invite Pini's questioning in light of her earlier statements that were inconsistent with a present willingness to discuss the case.  Notably, defendant told Pini early on that she wanted to contact her lawyer, and just before Pini asked the challenged questions, defendant stated that she did not want to listen.  Where a defendant "indicates in any manner" and at any stage of the process a desire to consult with an attorney before speaking, "the interrogation must cease." (*Miranda, supra,* 384 U.S. at pp. 473–474.)  Because defendant was under arrest, a *Miranda* advisement should have been given before she was asked any questions reasonably likely to elicit incriminating responses.  Moreover, Pini should have stopped his questioning after defendant indicated she wanted to contact her lawyer.

"The erroneous admission of a defendant's statements obtained in violation of the Fifth Amendment is reviewed for prejudice under the beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 [(*Chapman*)].  [Citations.]  That test requires the People here 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*People v. Elizalde* (2015) 61 Cal.4th 523, 542.)  That is to say, the error was " 'unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'  [Citation.]  Thus, the focus is what the jury actually decided and whether the error might have tainted its decision.  That is to say, the issue is 'whether the . . . verdict actually rendered in *this* trial was surely unattributable to the error.' "

(*People v. Neal* (2003) 31 Cal.4th 63, 86, (*Neal*).) "Another way to phrase the *Chapman* test is this: ' "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" ' " (*People v. Delgado* (2018) 27 Cal.App.5th 1092, 1109 (*Delgado*).)

Our review of the record satisfies us that the *Miranda* error was harmless beyond a reasonable doubt. As for defendant's response to Pini's first question, the record reflects that defendant voluntarily told Pini well before her arrest that she was the driver of the black SUV. Defendant does not contend that this pre-arrest statement was made during a custodial interrogation or taken in violation of the Fifth Amendment. Meanwhile, multiple witnesses at the scene identified defendant as the driver of the black SUV. Simply put, defendant's identity as the driver of the car that hit Nemeroff was not disputed.

As for defendant's response to Pini's second question, the erroneous admission of this evidence was unimportant in relation to everything else the jury properly considered on the issue in question. (*Neal*, *supra*, 31 Cal.4th at p. 86.) Specifically, the jury was presented with defendant's prior convictions in 2008 (misdemeanor DUI) and 2014 (wet reckless) and the related plea agreements which contained signed *Watson* admonitions reflecting defendant's explicit acknowledgement that if she killed someone while driving intoxicated, she could be charged with murder. The jury also heard testimony that defendant attended Second Chance courses after her 2008 DUI conviction. "[E]vidence that a defendant has suffered a prior conviction and participated, as a condition of probation, in some form of alcohol education program which emphasized the dangers of driving while intoxicated is relevant to prove the accused's awareness of the life threatening risks caused by his conduct." (See *People v. Brogna* (1988) 202

Cal.App.3d 700, 709.) None of this evidence was in factual dispute, and defendant offered no theory countering their evidentiary value.

On this record, it is clear beyond a reasonable doubt that a rational jury would have come to the same verdict absent the *Miranda* error. (*Delgado, supra,* 27 Cal.App.5th at p. 1109.)

**D. Sixth Amendment Right of Confrontation**

Defendant argues that the admission of testimony and evidence regarding her June 2017 and January 2019 blood tests violated her Sixth Amendment right of confrontation because the reports contained testimonial statements by a non-testifying witness (Alan Barbour) whom defendant had no opportunity to cross-examine. We conclude the errors were harmless beyond a reasonable doubt, and we reject defendant's ineffective assistance claim based on her counsel's failure to object to certain exhibits.

**1.** *Background*

Defendant moved in limine to exclude evidence of the June 2017 blood-alcohol analysis on confrontation grounds because Barbour would not be testifying at trial. The trial court denied the motion.

At trial, Bill Posey testified as an expert in forensic toxicology. He described the testing of defendant's blood samples that he and Barbour performed in June 2017 as follows.

On June 1, 2017, CVT received two vials of defendant's blood. Posey performed a drug screen, which revealed the presence of cocaine and its metabolites in defendant's blood.

Barbour, who "overs[aw] the alcohol department" at CVT, performed the alcohol testing on defendant's blood sample and determined her BAC was 0.13 percent. Barbour utilized "a gas chromatograph that was coupled with a flame ionization detector." After describing the gas chromatography process,

Posey explained he had access to and reviewed Barbour's reports, notes, and computer- generated data from the June 2017 test, and he (Posey) confirmed it was the same process he had described in his testimony. Posey opined that for a hypothetical individual who stopped drinking alcohol at 10:00 a.m. and who had blood drawn at 1:15 p.m. of the same day, "you theoretically would be adding a .03 to a .06 to [the test result] level to estimate what was there at 10 [a.m.]"

In addition to explaining the gas chromatography process, Posey described the laboratory's method of setting "known controls and standards" before samples were tested. Posey reviewed records, notes, and data on the accuracy testing process and saw nothing to suggest the June 2017 test results were inaccurate. The laboratory also kept "a forensic alcohol work log that is filled out as the analyses are being performed, and the results from the printed report are transcribed to that work log, and it is evaluated to verify that everything was transcribed properly as well as the transcription to the work card. [¶] Once the analysis is completed, the work card is given to clerical staff in which they enter the information of the final result of the analysis into the computer, but that is then brought back to not only the analyzing individual, but also a set of other eyes, toxicologists, to review the report."

Once Posey and Barbour completed testing on defendant's blood sample, a report was generated, which they both reviewed and signed before its submission to the Livermore Police Department.

Posey further testified regarding the circumstances that led to the second blood-alcohol analysis in January 2019. Because Barbour had retired and refused to testify, the district attorney asked CVT to retest defendant's blood "so that someone else could testify, if needed." Posey performed the

retesting in January 2019, using the second of the two vials of defendant's blood. The second test showed a BAC of 0.11 percent. Posey explained that the second result was "slightly lower" than the first because of "equilibration of the sample within its vial," meaning there is "always a space of air" within a vial of blood and "[an] equilibrium that will adjust over time between the alcohol that's in the sample and the space that the air is present."

### 2. *Analysis*

The Sixth Amendment gives a criminal defendant the right to confront and cross-examination adverse witnesses. (*People v. Lopez* (2012) 55 Cal.4th 569, 576 (*Lopez*).) In *Crawford v. Washington* (2004) 541 U.S. 36, 59, the United States Supreme Court held that the confrontation clause prohibits the admission of testimonial statements made by a non-testifying witness unless the witness is unavailable, and the defendant had a prior opportunity for cross-examination. To be "testimonial," the out-of-court statement "must have been made with some degree of formality or solemnity," and its primary purpose must "pertain[] in some fashion to a criminal prosecution." (*Lopez*, at pp. 581–582.)

The People concede, and we agree, that the June 6, 2017, report constituted a testimonial statement under *Crawford*. The report was made with the necessary formality, as it bore the signatures of Barbour and Posey, each "certify[ing], under penalty of perjury, that [the report] is a true and correct copy of results of the analysis on blood or urine obtained during the regular course of my duties." (See *Bullcoming v. New Mexico* (2011) 564 U.S. 647, 665 (*Bullcoming*) [certified laboratory report that referred to state court rules regarding admission of blood-alcohol analyses was testimonial]; *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 310–311 [sworn certificates of laboratory analysts were testimonial].) The report also

indicated that the agency requesting the blood analysis was the Livermore Police Department, reflecting that the report's primary purpose pertained to a criminal prosecution. (*Lopez*, *supra*, 55 Cal.4th at pp. 581–582.)

The People contend, however, that Posey was an adequate substitute for Barbour for confrontation clause purposes because he personally hired Barbour; the two worked together prior to and at CVT for many years; and they each reviewed the final June 6, 2017, report before signing it. The People rely for this position on the concurring opinion of Justice Sotomayor in *Bullcoming*.

In *Bullcoming*, the United States Supreme Court addressed whether an individual who did not perform a laboratory analysis could testify as to the results. The testing in question was a gas chromatograph analysis performed and certified by a non-testifying analyst (Caylor), but the prosecution did not call Caylor to testify and instead introduced the test results through Razatos, who was familiar with the laboratory's procedures but had not participated in or observed the testing in question. (*Bullcoming*, *supra*, 564 U.S. at pp. 651, 655.) Justice Ginsberg delivered a four-part plurality opinion holding that the surrogate's testimony did not meet constitutional muster. Part II of the *Bullcoming* decision, which garnered a majority of the court (with the exception of a footnote), explained that Razatos's testimony was insufficient for confrontation clause purposes because despite being qualified as an expert on gas chromatography and the laboratory's procedures, Razatos "could not convey what Caylor knew or observed about the events his certification concerned, i.e., the particular test and testing process he employed. Nor could such surrogate testimony expose any lapses or lies on the certifying analyst's part." (*Id.* at pp. 661–662, fn. omitted.) Justice Ginsburg also noted

32

that the prosecution did not assert that Razatos had given an independent opinion concerning the test results.  (*Id*. at p. 662.)

In a concurring opinion, Justice Sotomayor made several observations "to emphasize the limited reach of the Court's opinion."  (*Bullcoming, supra,* 564 U.S. at p. 668 (conc. opn. of Sotomayor, J.).)  As relevant here, Justice Sotomayor observed, "this is not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue. . . .  It would be a different case if, for example, a supervisor who observed an analyst conducting a test testified about the results or a report about such results."  (*Id*. at pp. 672–673.) Justice Sotomayor also noted that *Bullcoming* was not a case where "an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted in evidence," and did not involve "only machine-generated results, such as a printout from a gas chromatograph."  (*Id*. at p. 673.)

Based on the foregoing, we cannot agree with the People that the instant matter presents "precisely the case, posited by Justice Sotomayor." Posey did not testify that he was "a supervisor who *observed* [Barbour] conducting" the test in question. (*Bullcoming, supra,* 564 U.S. at p. 673, italics added.)  Rather, Posey testified that Barbour "overs[aw] the alcohol department" and, in connection with the June 2017 testing of defendant's sample, performed the alcohol testing while Posey performed the drug testing.  Posey's general testimony regarding the gas chromatographic process and the laboratory's procedures did not convey what Barbour actually knew or observed during the June 2017 test.  And though the language of the signed certification clause established that Posey certified the results of the

drug testing that he personally performed, it did not purport to represent his certification of Barbour's blood-alcohol test results.

Although Posey testified he reviewed Barbour's notes, records, and computer-generated data from the June 2017 test in preparation for his testimony, the details of those records were not disclosed at trial. Thus, we cannot make the necessary inference that Posey's preparatory review gave him the ability to convey what Barbour "knew or observed about the events his certification concerned," or to "expose any lapses or lies" on Barbour's part. (*Bullcoming, supra,* 564 U.S. at pp. 661–662; see *People v. Ogaz* (2020) 53 Cal.App.5th 280, 293 [surrogate could not be effectively cross-examined as to what analyst saw or how she interpreted information her testing produced because gas chromatographic testing requires subjective analysis].) Accordingly, the record fails to demonstrate that Posey was a sufficient surrogate for Barbour.

Nevertheless, we conclude any confrontation clause error was harmless because it is "clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error." (*People v. Loy* (2011) 52 Cal.4th 46, 69–70; see *People v. Arredondo* (2019) 8 Cal.5th 694, 709 [violations of confrontation clause subject to *Chapman* harmless error analysis].) As the record reflects, the jury had before it Posey's second and independent blood-alcohol test that he performed in January 2019, which showed a BAC of 0.11 percent. (See *Lopez, supra,* 55 Cal.4th at p. 584 [assumed confrontation clause error was harmless because testifying witness gave independent opinion "reflecting his 'separate abilities as a criminal analyst' " that defendant's BAC exceeded legal limit].) Although Posey's test result was slightly lower than Barbour's test result, it still showed a BAC well in excess of the legal limit. (Veh. Code, § 23152, subd. (b).)

We acknowledge that the prosecutor drew the jury's attention to the 0.13 percent result several times during opening and closing arguments. But the prosecutor told the jury it could apply either "the .13 percent or even the .11 percent" to the DUI instruction. Thereafter, the prosecutor argued that "the reasonable conclusion you're allowed to draw from her blood being at least .11 percent is it's way over .08." Thus, the jury was presented with the 0.11 percent result as a fully independent basis for a finding of impairment. Defendant does not argue that the jury was urged to place additional weight on the fact that *two* blood tests showed a BAC above the legal limit, and our review of the prosecutor's opening remarks and closing argument discloses no effort to tout the combined effect of the two test results. On this record, we are satisfied beyond a reasonable doubt that the jury would have returned the same verdict in the absence of the June 2017 report and Posey's related testimony.[10]

Defendant raises an additional challenge to the admission of People's exhibits nos. 3-D8, D9, and D10, arguing that these exhibits contained information derived from Barbour's testing. Defendant acknowledges that

---

[10]    Our conclusion is not affected by defendant's suggestion that the test results may have skewed high because Posey could not say whether the samples were refrigerated prior to delivery. Even assuming for the sake of argument that the samples were not refrigerated, Posey's testimony on this score did little, if anything, to suggest short-term nonrefrigeration increased the BAC in defendant's samples. To the contrary, Posey explained that nonrefrigeration could speed up the equilibration process, thereby lowering the alcohol level. While Posey also acknowledged that nonrefrigeration could lead to the growth of organisms that convert sugars to alcohol, he testified this possibility was "minimal" given the use of a preservative, and that it would only happen in the "long term," with no "measurable" affect in the short term, e.g., "within a five-day period." Here, the record reflects that CVT received defendant's blood samples six days after the blood was drawn and immediately refrigerated them until testing.

she forfeited any claim of error on Sixth Amendment grounds by not objecting to the exhibits below.  (See *People v. Burgener* (2003) 29 Cal.4th 833, 869.)  However, she contends her counsel's failure to object constituted ineffective assistance.

To prevail on her ineffective assistance claim, defendant must show that her counsel's performance was deficient, and that the deficient performance prejudiced her defense.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687–694 (*Strickland*).)  To establish prejudice, defendant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  (*Id.* at pp. 693–694.)  In order to determine whether counsel's failure to object was ineffective and/or prejudicial, we must address the merits of defendant's Sixth Amendment claims.  (*People v. Osband* (1996) 13 Cal.4th 622, 693 (*Osband*).)

People's exhibits nos. 3-D8 and D9 contained copies of Posey's second and third reports from the blood-alcohol analysis that *he* performed in January 2019.  Because Posey was a testifying witness at trial, the admission of these reports raised no confrontation clause problems.  Accordingly, a Sixth Amendment objection to these two exhibits would have been futile, and counsel's omission did not constitute ineffective assistance.  (See *People v. Diaz* (1992) 3 Cal.4th 495, 562.)

Exhibit 3-D10 was a toxicology report by Barbour dated October 28, 2015, showing defendant's BAC to be 0.19 percent in a prior incident.  The prosecution had offered this exhibit as part of its efforts to establish that defendant acted with implied malice in committing the instant offense.  For the same reasons discussed above, we conclude that the report was testimonial in nature and that Posey was not an adequate surrogate to

36

satisfy the confrontation clause.[11]  Nevertheless, counsel's failure to object on Sixth Amendment grounds to this one exhibit and Posey's related testimony was harmless.  Even if defense counsel had successfully objected, the prosecution had presented other evidence including the responding officer's testimony regarding the visible signs of defendant's intoxication during the 2015 arrest; the evidence of defendant's prior DUI convictions in 2008 and 2014; and the plea agreements containing defendant's signed *Watson* admonishments.  This was ample evidence establishing that defendant "*actually appreciated*" the hazards and legal consequences of drunk driving to support the element of implied malice.  (*Watson*, *supra*, 30 Cal.3d at pp. 296–297.)  Accordingly, it is not reasonably probable that the results would have been different absent counsel's failure to object to the October 2015 report and related testimony.  (*Strickland*, *supra*, 466 U.S. at pp. 693–694.)

In sum, we conclude that any error in the admission of the testimony and exhibits regarding Barbour's June 2017 toxicology test was harmless beyond a reasonable doubt.  We also conclude that defense counsel's failure to object was not ineffective as to People's exhibit nos. 3-D8 and D9, and was harmless as to exhibit no. 3-D10.

**E. Due Process**

Defendant contends she was deprived of due process and a fair trial when (1) the prosecutor commented on her refusals to consent to having her blood drawn; and (2) the trial court permitted Pini to testify as to the statistical probability of defendant's intoxication based on her performance on the field sobriety tests.  We find no due process violations.

---

[11]    The October 2015 report was certified only by Barbour, and Posey did not testify that he personally observed Barbour's performance of the test.

### 1. *Comment on Refusal to Consent to Blood Draw*
#### a. Background

Defendant moved in limine to exclude evidence of her refusal to consent to a blood draw, arguing that her refusal to do so was irrelevant and that she had the right to refuse "prior to [her] arrest." The prosecutor argued that even if her refusal was "pre-arrest," it was still "admissible as consciousness of guilt." The trial court ruled that because defendant had refused "multiple requests for blood," both before and after her arrest, the court was "not going to exclude the one before the arrest, because I think it's essentially of no consequence, because she's done it multiple times."

At trial, Pini testified that shortly after contacting defendant, and prior to placing her under arrest, defendant refused to submit to a voluntary blood draw. Later, after placing defendant under arrest, Pini asked defendant if she would submit to a breath test or blood draw, and she refused.

Defendant's sister, Stephanie S., testified at trial that during a jail telephone call after the arrest, defendant explained that she did not want to take an alcohol test because she had been drinking before.

During closing arguments, the prosecutor argued to the jury that "there's even more evidence to show you that she was under the influence. This comes by the way of her refusal to take the blood test. And you were instructed on this instruction for consciousness of guilt." The prosecutor continued, "If the defendant refused to submit to such a test after being asked to take it by a police officer, then the defendant's conduct may show that she was aware of her guilt. She didn't want to take the test because she knows it was going to show that she had been drinking and doing drugs. That's why she didn't want to take the test. It shows she knew that she was guilty. She was guilty of driving while under the influence, and she didn't

want more proof against her to show that. She didn't want that scientific evidence to show that against her."

### b. Analysis

In *People v. Sudduth* (1966) 65 Cal.2d 543 (*Sudduth*), our Supreme Court held that a jury instruction and commentary by the prosecution on a defendant's refusal to submit to breathalyzer and field sobriety tests were "constitutionally admissible." (*Id.* at pp. 545–546.) As the court explained, "The sole rationale for the rule against comment on a failure to testify is that such a rule is a necessary protection for the exercise of the underlying privilege of remaining silent [citation]. A wrongful refusal to cooperate with law enforcement officers does not qualify for such protection. A refusal that might operate to suppress evidence of intoxication, which disappears rapidly with the passage of time [citation], should not be encouraged as a device to escape prosecution." (*Id.* at p. 546.) In so concluding, *Sudduth* relied on *People v. Ellis* (1966) 65 Cal.2d 529, 536–537, which held that evidence of a defendant's refusal to take a voice identification test was similar to other types of circumstantial evidence of consciousness of guilt, such as escape from custody, and did not violate the Fifth Amendment.[12]

Failing to address *Sudduth*, defendant relies instead on cases involving the right to refuse to consent to a search of one's home. (See *People v. Keener* (1983) 148 Cal.App.3d 73, 78 [evidence of defendant's refusal to consent to search of home erroneously admitted to show consciousness of guilt]; *People*

---

[12]  Although *Sudduth* did not involve blood testing, Justice Traynor noted that blood testing in DUI cases was "an evidence-gathering technique recently approved in" *Schmerber*. (*Sudduth, supra*, 65 Cal.2d at p. 546.) On this score, *Schmerber* held that the Fifth Amendment did not bar compelled blood testing for a motorist suspected of DUI because blood is physical evidence, and testing it did not compel the motorist to incriminate himself. (*Schmerber, supra*, 384 U.S. at pp. 761–765.)

*v. Wood* (2002) 103 Cal.App.4th 803, 808–809 [same]; *Camara v. Municipal Court of San Francisco* (1967) 387 U.S. 523, 540 [lessee could "not constitutionally be convicted for refusing to consent" to warrantless inspection by city housing inspectors].)  But these cases are not controlling in light of *Sudduth* and other authorities permitting consciousness of guilt evidence based on a defendant's refusal to provide blood or other exemplars. (See *Sudduth, supra,* 65 Cal.2d at pp. 546–547; *People v. Farnam* (2002) 28 Cal.4th 107, 164 [permitting instruction on consciousness of guilt on refusal to provide hair and blood samples in accordance with court order]; *Marvin v. Department of Motor Vehicles* (1984) 161 Cal.App.3d 717, 720 [DUI suspect's refusal to take field sobriety test was evidence of consciousness of guilt].)

An exception to the general admissibility of such refusal evidence exists where there is a statutory right to refuse the test in question; otherwise, the exercise of that right would be rendered meaningless.  (See *People v. Zavala* (1966) 239 Cal.App.2d 732, 736–737, 740–741 [error to instruct on consciousness of guilt for refusal to take Nalline drug test because prior Health & Saf. Code, § 11723 conferred right to refuse].)  Thus, in *People v. Jackson* (2010) 189 Cal.App.4th 1461 (*Jackson*), a previous panel of this court held it was error to admit evidence of a defendant's refusal to take a preliminary alcohol screening (PAS) breath test because the defendant had an express statutory right under the implied consent law to refuse a PAS test.  (*Jackson*, at pp. 1467–1469, citing Veh. Code, § 23612, subds. (h), (i).)

But the implied consent law does not confer a statutory right to a lawfully arrested motorist to refuse chemical testing of their blood or breath. To the contrary, the statute provides that "[a] person who drives a motor vehicle is deemed to have given his or her consent to chemical testing of his or her blood or breath for the purpose of determining the alcoholic content of

40

his or her blood, if lawfully arrested for" a DUI offense. (Veh. Code, § 23612, subd. (a)(1)(A), (B).) Although the implied consent law "implicitly grants a suspect the right not to consent to a test," the exercise of that implied right "will have consequences" (*People v. Lopez* (2020) 46 Cal.App.5th 317, 326), including fines, driver's license suspension, or imprisonment if convicted. (Veh. Code, § 23612, subd. (a)(1)(D).) Moreover, "the refusal may be used against him or her in a court of law." (*Id.*, subd. (a)(4).) In short, the implied consent law provides no exception to the general admissibility of refusal evidence regarding chemical testing of breath and blood for motorists lawfully arrested for DUI.

Defendant argues that because the implied consent law applies only to motorists who are "lawfully arrested" for a DUI (see, e.g., Veh. Code, § 23612, subds. (a)(1)(A), (B), (d)), the jury never should have heard the evidence of her pre-arrest refusal to submit to a blood draw. But *Sudduth* did not rely on the circumstance of a lawful arrest to justify comment on a DUI defendant's refusal to submit to physical testing, nor did *Sudduth* hold that a defendant's refusal to submit to testing prior to arrest is inadmissible.

In any event, even assuming for the sake of argument that the statutory phrase "lawfully arrested" provides a limiting principle, and that the trial court should have granted, in part, defendant's motion in limine as to the evidence of her pre-arrest refusal, we conclude the assumed error and related prosecutorial commentary did not infect the entire trial with such unfairness as to deny defendant due process. (See *People v. Partida* (2005) 37 Cal.4th 428, 439 ["the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*"]; *People v. Bell* (1989) 49 Cal.3d 502, 534 [same re prosecutorial conduct].) Here, evidence of defendant's post-arrest refusal to consent to the

blood draw was properly admitted to show consciousness of guilt (Veh. Code, § 23612, subd. (a)(4); *Sudduth*, *supra*, 65 Cal.2d at pp. 546–547), and the prosecutor did not emphasize the pre-arrest statement over the post-arrest one. On this record, the state law error did not rise to the level of a due process violation.

## 2. *Statistical Probability Evidence*
### a. Background

At trial, Officer Pini described the field sobriety tests he administered to defendant and his observations of her performance. For the HGN test, Pini looked for involuntary jerking of defendant's eyes as she tracked a pen that he moved in front of her. Pini testified that "if there's four or more clues in doing the nystagmus test that you have an 88 percent probability that they're a .08 or greater." Pini saw six "clues" when conducting the HGN test on defendant.

For the modified Romberg test, Pini asked defendant to tilt her had back, close her eyes, and estimate when 30 seconds had elapsed. Pini testified that the "standard" was "usually plus or minus 10 seconds within the 30 seconds," but defendant "believed 30 seconds had passed when only 12 seconds had passed."

For the heel-to-toe (or walk and turn) test, Pini instructed defendant to walk nine steps forward on an imaginary line, heel to toe and arms down to her sides, before pivoting and returning in the same fashion. The "clues" of impairment included starting too soon, not touching heel to toe, stepping off the line, raising arms, and losing balance. Pini explained that two clues would "show[] it as a 79 percent probability that they were a .08 or greater," and Pini observed four clues during defendant's performance of this test.

For the one leg stand test, Pini had defendant stand on one leg with her arms down and her other leg six inches off the ground while pointing the toe and looking at it. Pini testified that the probability of intoxication with two or more clues on this test was "83 percent," and with defendant, he observed three clues.

Pini testified that he learned how to perform the field sobriety tests based on guidelines from the National Highway Traffic Safety Administration, and that his testimony regarding the probabilities of impairment were based on a study conducted by "seven California institute [*sic*]."[13]

### b. Analysis

Defendant argues that Pini's testimony on the statistical probabilities of her intoxication based on her performance on the field sobriety tests deprived her of due process and invaded the province of the jury. The People respond that this claim is, in substance, a challenge to the scientific validity and reliability of the field sobriety tests under *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) and *Frye v. United States* (D.C.Cir. 1923) 293 F. 1013, and that defendant forfeited this claim by failing to object below. Defendant's challenge does not appear based on *Kelly-Frye*, but on the principle that field sobriety test results can only be used as circumstantial, not direct, evidence of intoxication. As we understand the briefing, defendant contends that Pini's use of statistics gave him "unearned credibility" and constituted improper direct evidence that defendant's BAC was beyond the legal limit, a finding that invaded the province of the jury. On these particular points, we

---

[13] There was no further clarification in the record as to the exact name of this organization. Defendant suggests that Pini said or meant to say the Southern California Research Institute.

agree that defendant's failure to object at trial forfeited review of her claim on appeal.  (*People v. Anderson* (2020) 9 Cal.5th 946, 961.)

Even were we to overlook the forfeiture, we are not persuaded that defendant was deprived of due process.

We begin by noting that in *People v. Joehnk* (1995) 35 Cal.App.4th 1488, 1507–1508 (*Joehnk*), the court held that HGN testing was generally accepted in the relevant scientific community as reliable for purposes of *Kelly-Frye*.  In so holding, *Joehnk* clarified that "there is no claim HGN testing alone can determine whether a suspect is under the influence of alcohol nor determine a blood-alcohol level." (*Id.* at p. 1504; see also *People v. Randolph* (2018) 28 Cal.App.5th 602, 611–612 [trained officer may testify as to significance of HGN test performance as only "part of an officer's total observations of a suspect"]; accord, *United States v. Horn* (D.Md. 2002) 185 F.Supp.2d 530, 551 [finding that most states allowing HGN evidence permit it only as circumstantial proof of intoxication].)  These decisions generally support defendant's position that the results of HGN testing are admissible only as circumstantial, not direct, evidence of intoxication.  Although these cases addressed only the HGN test, we accept for purposes of argument that the same proposition applies to all of the tests discussed by Pini at trial.

We cannot agree, however, that Pini's use of statistics invaded the province of the jury on the ultimate issue of defendant's guilt (*People v. Prince* (2007) 40 Cal.4th 1179, 1227 (*Prince*)) or constituted direct evidence of defendant's intoxication or BAC. Viewed in context, Pini testified that defendant's performance on the field sobriety tests was one factor among others (i.e., collision, visible signs of intoxication) that informed his decision to arrest her.  Meanwhile, the prosecutor properly framed such test results as one of several pieces of circumstantial evidence that the jury could consider to

44

find that defendant was impaired. Indeed, in discussing the differences between direct and circumstantial evidence, the prosecutor stated, "And a lot of those things that we've been talking about, about the collision, and those types of things, those objective signs, *her performance on the field sobriety tests*, those are circumstantial evidence of her being under the influence." (Italics added.)

We see no indication in the record that Pini's use of statistics gave him "unearned credibility" or " 'distracted' " the jury from discharging its responsibility to weigh the evidence on the issue of guilt, as defendant contends. Of note, the jurors requested to watch the field sobriety test video footage during their deliberations, suggesting they did not automatically accept Pini's testimony but instead independently considered and weighed the evidence of defendant's performance on the tests, in conjunction with the other evidence, to find that she was under the influence at the time of the collision.

*People v. Collins* (1968) 68 Cal.2d 319 (*Collins*) and *People v. Julian* (2019) 34 Cal.App.5th 878 (*Julian*) do not persuade us otherwise. In *Collins*, a mathematics instructor gave expert testimony that based on certain physical attributes of the defendants, there was only a one-in-12-million chance that the defendants were not guilty. (*Collins*, at p. 325.) In reversing the judgment, *Collins* held that the expert's opinion testimony was based on assertions that had no evidentiary basis, and that the characteristics he selected for analysis were not mutually independent. (*Id.* at pp. 327–328.) The error in *Collins* was prejudicial "because it distracted the jury from its task and encouraged jurors to rely upon 'an engaging but logically irrelevant expert demonstration.' " (*Prince, supra*, 40 Cal.4th at p. 1228, citing *Collins*, at p. 327.)

In *Julian*, the prosecution called an expert witness on child sexual abuse accommodation syndrome (CSAAS), who testified it was very rare for children to make false allegations of molestation, occurring in only one to eight percent of cases. (*Julian*, *supra*, 34 Cal.App.4th at p. 883.) While observing that expert testimony on CSAAS is admissible to rehabilitate witness credibility, *Julian* held such testimony is not admissible to prove that the complaining witness has, in fact, been sexually abused or that the witness is telling the truth. (*Id*. at p. 885.) Nor can a CSAAS expert give " 'predictive conclusions' " such as the child " 'should be believed.' " (*Id*. at p. 886.) In so holding, *Julian* cautioned that expert opinions on the statistical probability of guilt may distract the jury from its function of weighing the evidence on the issue of guilt. (*Ibid*.)

Pini's statistical references created no such distraction for the jury here. Pini did not use statistics to bolster or attack a witness's credibility, and he did not invite the jurors to presume defendant was guilty based solely on the statistics he cited. Rather, Pini cited statistics to support his testimony that he had probable cause to arrest defendant. Meanwhile, the prosecutor properly framed the field sobriety test results as circumstantial evidence the jury could consider, in conjunction with other evidence, to make the determination that defendant was under the influence of alcohol. In short, the jury was not distracted from its role, and defendant's due process rights were not violated by Pini's use of statistics during his testimony.

**F. Prosecutorial Misconduct**

Defendant contends the prosecutor committed misconduct by (1) telling the jury it could not "consider" the lesser offense of involuntary manslaughter until it acquitted defendant of murder, which contravened the holding of *People v. Kurtzman* (1988) 46 Cal.3d 322 (*Kurtzman*); and (2) offering

46

inadmissible evidence—namely, a video on the consequences of drunk driving that was not in existence when defendant attended Second Chance in 2008.

### 1. Kurtzman *Error*

Defendant contends the prosecutor committed *Kurtzman* error when she told the jury during closing arguments: "You cannot move on to even consider involuntary manslaughter unless you all 12 agree that she is not guilty of murder." Defendant acknowledges that she failed to preserve her claim of *Kurtzman* error by not objecting and requesting an admonition (see *People v. Crew* (2003) 31 Cal.4th 822, 839), but contends that her counsel rendered ineffective assistance in failing to do so. We conclude, based on our consideration of the merits of defendant's claim (see *Osband, supra,* 13 Cal.4th at p. 693), that defense counsel's failure to object to the prosecutor's *Kurtzman* error amounted to deficient performance, but that defendant suffered no prejudice from it.

Under California's "acquittal-first" rule, "a trial court may direct the order in which jury verdicts are returned by requiring an express acquittal on the charged crime before a verdict may be returned on a lesser included offense." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1110.) In *Kurtzman*, the Supreme Court rejected a stricter acquittal-first rule "under which the jury must acquit of the greater offense before even considering lesser included offenses." (*Kurtzman, supra,* 46 Cal.3d. at pp. 329, 333–334.) Thus, it is error for a trial court to instruct a jury not to " 'deliberate on' or 'consider' " lesser-included offenses before reaching a conclusion on the greater offense. (*Id.* at p. 335.)

The People concede, and we agree, that the prosecutor committed *Kurtzman* error by telling the jury it could not even "consider" the lesser offense of involuntary manslaughter until it acquitted defendant of the

47

murder charge.  (See, e.g., *People v. Perez* (1989) 212 Cal.App.3d 395, 399.)  It follows, then, that defense counsel should have objected to the prosecutor's *Kurtzman* error.  Nonetheless, reversal is required only if defendant demonstrates that counsel's deficient performance prejudiced her defense.  (*Strickland*, *supra*, 466 U.S. at p. 687.)

Because *Kurtzman* error "implicate[s] California law only," prejudice is shown if the error had " 'a reasonable probability of an effect on the outcome.' " (*People v. Berryman* (1993) 6 Cal.4th 1048, 1077, fn. 7 (*Berryman*), overruled on other grounds by *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 (*Hill*).)  Our Supreme Court, however, has noted an "inherent difficulty" in demonstrating prejudice from *Kurtzman* error.  (*People v. Fields* (1996) 13 Cal.4th 289, 309, fn. 7.)  This is because, "in the abstract," an erroneous instruction that a jury must acquit on a greater charge before turning to lesser charges "appears capable of either helping or harming either the People or the defendant.  In any given case, however, it will likely be a matter of pure conjecture whether the instruction had any effect, whom it affected, and what the effect was." (*Berryman*, at p. 1078, fn. 7.)

We conclude the prosecutor's *Kurtzman* error, as well as defense counsel's failure to object to it, were not prejudicial in light of the strong evidence of defendant's guilt for the greater offense of *Watson* murder.  Courts that have upheld *Watson* murder convictions " 'have relied on some or all of the following factors' that were present in *Watson*:  '(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving.' " (*People v. Wolfe* (2018) 20 Cal.App.5th 673, 682–683.)

Here, the January 2019 gas chromatograph analysis conducted by Posey showed defendant's BAC to be 0.11 percent, well above the legal limit.

(Veh. Code, § 23152, subd. (b).) Other evidence supported a finding that defendant subjectively appreciated the hazards posed by her decision to drive intoxicated, e.g., her prior DUI arrests and convictions, her participation in alcohol education programs that emphasized the dangers of driving while intoxicated, and her plea agreements in 2008 and 2014, which included *Watson* admonitions in which defendant acknowledged the legal consequences of driving drunk and killing a person. All this provided powerful and substantial evidence supporting the jury's finding that defendant drove under the influence with conscious disregard for life to support the greater offense of *Watson* murder.

Furthermore, unlike the cases involving prejudicial *Kurtzman* error, the jury here did not appear to be deadlocked on the greater charge. (See *People v. Olivas* (2016) 248 Cal.App.4th 758, 769 [prejudicial *Kurtzman* error where jurors were told they could not consider alternative charge if they were hung].) While the jury did ask two questions about the definition of implied malice,[14] there was no indication the jury was seriously grappling with the evidence on this element. After receiving the jury's questions, the trial court heard arguments from counsel, reassembled the jury, and simply restated its prior instruction on the element of malice. The jury then returned to deliberations, and five minutes later, announced it had reached a verdict. In all, the jury deliberated for a little over two hours on the first afternoon and the same amount of time the following morning before reaching its verdict. There is no indication that the jury was deadlocked or significantly conflicted

---

[14] The jury's note read: "We have two questions for the judge about the definition of implied malice in the law: (1) Does a defendant have to be actively thinking of the consequences of their actions & risk at the moment of starting the vehicle, if they are under the influence? (2) Or if knowledge existed prior to starting the car, does this qualify as 'knowing?'"

49

over defendant's guilt at any time. Under these circumstances, and in light of the strong evidence of defendant's guilt for *Watson* murder, it is "a matter of pure conjecture" whether the prosecutor's unobjected to *Kurtzman* error "had any effect" on the ultimate verdict reached. (*Berryman*, *supra*, 6 Cal.4th at p. 1078, fn. 7.) Accordingly, we conclude defense counsel's failure to object to the prosecutor's *Kurtzman* error was not prejudicial.

### 2. *Inadmissible Evidence*

Defendant argues that the prosecution committed misconduct by offering inadmissible evidence—specifically, a portion of a video program entitled "Intoxication Nation" that was played to the jury to demonstrate that defendant received educational instruction at Second Chance on the hazards and legal consequences of drunk driving.

The trial court initially overruled the defense's objection to the video based on testimony from Alfonso Morales-King, a coordinator at Second Chance, who told the court that he "believe[d]" the video was in use in 2008 when defendant attended. After the video was played, however, the trial court noted that the video displayed a date stamp of " '9/21/12.' " Upon further questioning, Morales-King testified that while the particular video might not have been shown in 2008, similar video clips were shown. The court then reversed its prior ruling and admonished the jury: "You're going to be able to consider this as examples, these clips you saw, according to this gentleman's testimony, examples of the types of things they show to students in these sessions, but you won't have this available to review again during your deliberations since it's not going to be in evidence."

"Prosecutorial error occurs under state law when the district attorney uses 'deceptive' or 'reprehensible methods' to sway a jury or judge, resulting in a reasonable probability that the defendant would have received a more

favorable outcome absent this conduct." (*People v. Zaheer* (2020) 54 Cal.App.5th 326, 337–338.) While not rising to the level of reprehensible conduct, the prosecutor's proffer of the Intoxication Nation video as a video that was shown to defendant in 2008 was certainly improper and misleading. Nevertheless, any potential harm was cured by the trial court's prompt admonition that the jury could consider the video only as an example of the type of instruction defendant received. The prosecutor's error was not so egregious that the admonition could not cure it (see *Hill, supra,* 17 Cal.4th at p. 821), and we assume the jury did as instructed (see *People v. Flinner* (2020) 10 Cal.5th 686, 737, fn. 12).

### G. Instructional Error

Defendant contends the trial court erred in failing to instruct the jury that it could consider the lesser included offense of involuntary manslaughter before acquitting defendant on the greater offense of murder. The People argue that the trial court correctly instructed on the acquittal-first rule, and to the extent any further clarification was necessary, defendant forfeited her claim by not requesting it below. Defendant maintains that the trial court had a sua sponte duty to clarify the law given the prosecutor's *Kurtzman* error.

We will consider the merits of defendant's claim. (See *People v. Rogers* (2006) 39 Cal.4th 826, 850, fn. 7, & 880, fn. 28 [claim of failure to instruct sua sponte not forfeited]; Pen. Code, § 1259 [court may review any instruction even though no objection was made if defendant's substantial rights were affected].) "We review de novo whether a jury instruction correctly states the law. [Citation.] Our charge is to determine whether the trial court ' "fully and fairly instructed on the applicable law." [Citation.]' [Citation.] We look to the instructions as a whole and the entire record of trial, including the

51

arguments of counsel." (*People v. Mason* (2013) 218 Cal.App.4th 818, 825 (*Mason*).)

The trial court's instruction on involuntary manslaughter stated, in relevant part: "If all of you find that the defendant caused the death of another but is not guilty of the crime of murder, you may find her guilty of the lesser crime of *involuntary manslaughter* if you are convinced beyond a reasonable doubt that she is guilty of that lesser crime." On its face, the instruction did not run afoul of *Kurtzman*. But read in conjunction with closing arguments (*Mason, supra*, 218 Cal.App.4th at p. 825), the instruction could have inadvertently reinforced the prosecutor's incorrect statement of law. Specifically, in instructing the jury that it could find defendant guilty of the lesser crime "[i]f all of you find that the defendant . . . *is not guilty of the crime of murder*," the italicized language could have been construed as requiring the jury to *acquit* on the murder charge *before* it could turn to the lesser offense. It is plausible, then, that the instruction implicitly ratified the prosecutor's *Kurtzman* error.

In any event, any assumed instructional error was harmless for the same reasons discussed above as to claim of prosecutorial *Kurtzman* error. (*Berryman, supra*, 6 Cal.4th at p. 1077, fn. 7.)

**H. Cumulative Error**

Defendant argues the cumulative effect of the trial court's errors violated her right to due process and rendered the trial fundamentally unfair. We have identified or assumed the following errors: a Fifth Amendment violation for admission of defendant's un-*Mirandized* statements; a confrontation clause violation regarding the June 2017 and October 2015 blood tests; the erroneous admission and commentary on defendant's pre-arrest refusal to submit to the blood draw; and the prosecutor's *Kurtzman*

error and the related instructional error. While such errors are not insignificant in character or number, we have carefully and extensively considered the impact of each error in light of the record and applicable case law and find no prejudice. Moreover, viewing the record as a whole and taking into account the strength of the properly admitted evidence pointing to defendant's guilt, we cannot conclude that the errors combined in such a way as to result in a miscarriage of justice. "Defendant was entitled to a fair trial but not a perfect one." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) We are satisfied that defendant received a fair trial.

## DISPOSITION

The judgment is affirmed.

_____
Fujisaki, Acting P. J.


WE CONCUR:


_____
Petrou, J.


_____
Rodríguez, J.


*People v. Barbero* (A160615)

53